Slip Op. 07-13

## UNITED STATES COURT OF INTERNATIONAL TRADE

DANIEL ATTEBERRY,

        *Plaintiff,*

        v.

UNITED STATES,

        *Defendant.*

Court No. 02-00647

[Defendant's Motion to Withdraw Its Motion to Dismiss, To Amend Its Answer, and For Judgment on the Pleadings in favor of Plaintiff granted.]

Decided: January 25, 2007

Daniel Atteberry, Plaintiff *Pro Se.*

Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Jack S. Rockafellow); Yelena Slepak, Office of Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

## OPINION

RIDGWAY, Judge:

In this action, *pro se* plaintiff Daniel Atteberry contests the decision of the U.S. Customs Service ("Customs")[1] re-classifying for tariff purposes certain merchandise which he describes as "bike[s]/kart[s]/scooter[s]," imported from the Netherlands through the Port of Seattle in May 2001.

---

[1] The Customs Service was reorganized in 2003, and is now the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security.

Customs liquidated most of the merchandise under various subheadings of Chapter 87 of the Harmonized Tariff Schedule of the United States (2001) ("HTSUS") (which covers "Vehicles Other Than Railway or Tramway Rolling-Stock, and Parts and Accessories Thereof"), and assessed duties (depending on the item) at rates of up to 10% *ad valorem*. *See* Customs Summons and Protest Information Report (attached to Def.'s Letter Memorandum (Jan. 9, 2004)). Plaintiff contends that the merchandise instead is properly classifiable as entered, under HTSUS subheading 9501 ("Wheeled toys designed to be ridden by children . . . "), duty-free. *See id.*; Complaint (with attachments).

The history of this litigation can be traced through the three opinions it has spawned to date – Atteberry v. United States, 27 CIT 751, 267 F. Supp. 1364 (2003) (denying motion to dismiss pursuant to 28 U.S.C. § 2636(a)(1), which argued that action was not filed within 180 days of "date of mailing" of notice of denial of protest) ("Atteberry I"); 27 CIT 1051 (2003) (denying motion for reconsideration of Atteberry I) ("Atteberry II"); and 27 CIT 1070 (2003) (denying motion to dismiss pursuant to 28 U.S.C. § 2637(a) (2000),[2] which was based on Plaintiff's failure to pay all duties before commencing action) ("Atteberry III").

Now pending before the Court is Defendant's Motion to Withdraw Its Motion to Dismiss, To Amend Its Answer, and For Judgment on the Pleadings, and its brief in support thereof. *See generally* Defendant's Memorandum in Support of Its Motion to Withdraw Its Motion to Dismiss,

---

[2]All statutory references herein are to the 2000 edition of the United States Code.

Similarly, all references to regulations are to the 2001 edition of the Code of Federal Regulations. The pertinent text of the provisions cited remained the same at all times relevant here.

To Amend Its Answer, and For Judgment on the Pleadings ("Def.'s Brief"); *see also* Letter to Court from Counsel for Defendant (March 4, 2005) (Def.'s Supp. Brief").

In sum and substance, the Government's motion seeks to bring this litigation to a pragmatic close. The Government emphasizes that the duties at stake total less than $600 – a figure that will quickly be dwarfed by the "substantial economic impact" that "the parties and the judicial system as a whole" will face as a result of "discovery, motions, trial, and *the very real risk of appeal and re-trial*" if the action proceeds. *See* Def.'s Brief at 2 (emphasis added). The Government therefore seeks to withdraw its Motion to Dismiss,[3] to amend Defendant's Answer to "admit[] that the imported merchandise is classifiable as entered by plaintiff," and to have judgment on the pleadings entered in Plaintiff's favor. *See* Def.'s Brief at 2, 12-13.

For reasons that are somewhat difficult to understand (and personal to himself), Plaintiff opposes the motion. *See generally* Plaintiff's Response to All the Defendant's Memorandum . . . Motions (punctuation in the original) ("Pl.'s Brief"); Plaintiff's Response to Amended Answer; Plaintiff's Response to Judge Delissa A. Ridgway, and Resubmission of Evidence Appearing to Show the Government Has Been Lying to Me and the Court All Throughout This Case ("Pl.'s Supp. Brief").

Because it will confer on Plaintiff all the relief prayed for in his Complaint, and because – as detailed below – it is otherwise manifestly "in the interests of justice," Defendant's Motion is granted.

---

[3]Concurrent with its proposed withdrawal of its Motion to Dismiss, the Government requests vacatur of Atteberry III, which was addressed to that motion. *See* Def.'s Motion at 1-3, 6, 9; Atteberry III, 27 CIT 1070.

## I. **Background**

The material facts of this case are relatively straightforward, and not in dispute.[4] In late May 2001, a shipment of "bike[s]/kart[s]/scooter[s]" from the Netherlands was entered duty-free through the port of Seattle by plaintiff importer, Daniel Atteberry. Mr. Atteberry is a relative novice at importing, with only one prior experience, in October 1999 – when, importing apparently the same type of merchandise (albeit through a different port), the goods were liquidated as entered, duty-free. Thus, before the events that gave rise to this case, Plaintiff had no prior experience with Customs' protest process, and no experience with filing an action in this Court to challenge Customs' denial of a protest.

Based on his experience in his first foray into the world of importing, Plaintiff was apparently surprised when Customs began inquiring into his second entry of the same type of merchandise. He nevertheless responded promptly to Customs' two Requests for Information, which were conveyed to him through his broker. On his responses, he printed his telephone number in the appropriate box on the Customs form.

In late August 2001, a Customs Import Specialist telephoned Plaintiff, requesting certain additional information, which he supplied in a letter sent several days later. By Notice of Action dated September 5, 2001 and mailed to Plaintiff at his Kenmore, Washington address, Customs formally notified Plaintiff of its proposed reclassification of his merchandise, which would result in a "rate advance" (effectively assessing duties on merchandise which he had entered duty-free).

As a result of Customs' Notice of Proposed Rate Advance, further telephone and e-mail

---

[4]The facts summarized in this section are largely drawn from Atteberry III, 27 CIT 1070.

communications between Customs and Plaintiff ensued. Although he filed a timely response to the Notice of Proposed Rate Advance, Plaintiff did not prevail. By Notice of Action dated September 25, 2001 and mailed to Plaintiff's Kenmore, Washington address, Customs formally notified him that it had taken "rate advance" action on his merchandise "as proposed," and that "an increase in duties" would result.

A couple of weeks later, in mid-October 2001, Plaintiff moved from his Kenmore, Washington address. His next contact with Customs was on December 20, 2001, when he filed a timely Protest. His letter of Protest advised the agency that he had "No [mailing] Address at present," and provided his e-mail address (the same e-mail address that Customs had used to contact him once before, in September 2001).

In the meantime, the merchandise at issue had been liquidated. At about the same time, Customs issued its first bill to Plaintiff for the duties and interest owed as a result of the rate advance. That bill – dated October 19, 2001 and sent to the Kenmore, Washington address – never reached Plaintiff, who had moved from the address some days before. Indeed, the bill was eventually returned to Customs as undeliverable, on December 26, 2001. That same day, Customs received Plaintiff's Protest, which stated that he was no longer at the Kenmore address but could still be reached via e-mail. Customs nevertheless sent at least one more bill to the Kenmore address, for a total of four bills – the last on February 3, 2002. Plaintiff maintains that he received none of the four bills; and there is no evidence to suggest otherwise.

On April 3, 2002, Customs denied Plaintiff's Protest. That same day, a Customs representative sent Plaintiff an e-mail message at the e-mail address provided on his Protest. The

Customs representative explained that a decision had been reached on the Protest, and asked that

Plaintiff provide his "current mailing address" so that a copy of the agency's decision could be sent

to him. Plaintiff responded via e-mail, and Customs' decision on the Protest was dispatched to him

via U.S. Mail on April 9, 2003, at the "current mailing address" he provided to Customs, in Vashon,

Washington.

A handwritten notation the face of Customs' Notice of Denial referred Plaintiff to a

highlighted passage on a Customs form attached to the document, which stated:

> NOTE: If your protest is denied, in whole or in part, and you wish to CONTEST the
> denial, you may do so by bringing a civil action in the U.S. Court of International
> Trade *within 180 days* after the date of mailing of Notice of Denial. You may obtain
> further information concerning the institution of an action by writing the Clerk of
> U.S. Court of International Trade, One Federal Plaza, New York, NY 10007 (212-
> 264-2800).

(Emphasis added.) The Notice of Denial made no mention of the assessment of duties and interest,

much less the amount of the assessment. Nor was the amount of the assessment communicated in

any of Customs' other telephone and e-mail communications with Plaintiff, either before or after

the denial.

In the 180 days that followed Customs' mailing of the Notice of Denial, Plaintiff evinced his

continued interest in challenging Customs' action through a course of correspondence with the

Office of the Clerk of the Court. Eventually, Plaintiff completed and submitted a Summons, together

with a two-page letter dated October 3, 2002 (deemed his Complaint), which were received at the

Court and filed on Monday, October 7, 2002.

Because that day was the first business day after October 6, which was – in turn – the 181st

day following the mailing of Customs' Notice of Denial, Plaintiff satisfied the first of two applicable

jurisdictional requirements. 28 U.S.C. § 2636(a)(1). *See* Atteberry I, 27 CIT 751, 267 F. Supp. 2d 1364.[5] It is, however, undisputed that Plaintiff did not pay "all liquidated duties, charges, or exactions" before this action was filed.[6] The Government therefore sought to dismiss this action for lack of subject matter jurisdiction, based on Plaintiff's failure to comply with 28 U.S.C. § 2637(a).

The Government's motion was denied in Atteberry III, which reasoned that "28 U.S.C. § 2637(a) clearly contemplates that an importer will be on notice of the sum to be paid," and that – where Customs was on actual notice of Plaintiff's "current mailing address" (and, in fact, mailed the denial of protest to him at that address), but failed to send even a single bill to Plaintiff at any address during the critical 180-day period for commencement of an action in this court – Plaintiff's failure to pre-pay the assessed duties did not deprive the court of jurisdiction. *See generally* Atteberry III, 27 CIT at 1095.

Experienced litigators know that, with the meter running, there are some cases you can't even afford to *win*. Cognizant that the resources expended on litigation had already outstripped the relatively modest sum in dispute (and would continue to mount rapidly), the Government expressed

---

[5]The Government initially sought to dismiss this action on the grounds that it was commenced outside the 180-day window. The Government asserted that the Notice of Denial was mailed April 3, 2002 (and, indeed, filed the sworn statement of a Customs official to that effect). That motion to dismiss was denied, however, after Plaintiff produced the "smoking gun" – the envelope that Customs used to mail the Notice of Denial, postmarked April 9, 2002. *See* Atteberry I, 27 CIT 751, 267 F. Supp. 2d 1364.

[6]Plaintiff paid Customs the sum of $542 by personal check in April 2003, after a letter from counsel for Defendant specified the amount owed. *See* Atteberry III, 27 CIT at 1080 & n.31.

an interest in an amicable resolution of this matter.[7]

Shortly after Atteberry III issued, the Court convened a teleconference with the parties to discuss future proceedings in the case, and to encourage the parties to explore some sort of compromise. In the course of that teleconference, the Court walked the parties through a basic litigation cost/benefit analysis.

The Court explained to Plaintiff that – although he had prevailed on both jurisdictional challenges raised by the Government – he might still lose on the merits of the case, either at the trial level or on appeal. Plaintiff was also advised that, although the Court had ruled in his favor on both jurisdictional challenges, both of those rulings were extensions of the existing law and could be subject to appeal as well. In other words, Plaintiff was warned that, even if he were to prevail on the merits of the case, ultimately he could still lose the case on appeal on purely jurisdictional grounds.

---

[7]*Pro se* litigants are relatively insensitive to the typical economic incentives that drive the conduct of most parties vis-a-vis legal proceedings. In an August 6, 2003 teleconference in this case, the Court reminded the parties that the amount in dispute – although a significant sum for Plaintiff – is, objectively, a relatively modest sum; and the Court noted that, if Plaintiff were paying counsel to represent him (at the rate of $100 or $200 an hour, or more), he would have had a clear financial incentive to settle long before.

As the Supreme Court has observed, "[p]ro se petitioners have a greater capacity than most to disrupt the fair allocation of judicial resources because they are not subject to the financial considerations – filing fees and attorney's fees – that deter other litigants from filing frivolous petitions." In re Anderson, 511 U.S. 364, 365-66 (1994) (quotation omitted).

To date, Plaintiff's conduct of this litigation could not be deemed "frivolous." But it is no exaggeration to say that the case has consumed a disproportionate share of the resources (and occasionally strained the patience) of the Court and counsel for the Government, as well as the two lawyers who were successively appointed to represent him on a *pro bono* basis (and whom he discharged). In any event, no plaintiff – *pro se* or not – is entitled to pursue litigation beyond all reason.

The Government expressed concerns about the impact of <u>Atteberry III</u>, and signaled its tentative interest in appealing that ruling (if possible) at the appropriate time in the future. Following the teleconference, the Court appointed a second lawyer to represent Plaintiff, and counsel for both parties began settlement negotiations. Although the parties were unable to reach agreement on their own, counsels' mutual request for a settlement conference with the court suggested that an amicable resolution might be possible. In papers filed in anticipation of the settlement conference, Plaintiff's counsel explained:

> Although [the parties] do disagree about the classification of the goods in question, for purposes of a possible settlement, that has not been a significant issue. Instead, the significant issues are the extent of the Court's powers regarding classification for future importations and under what circumstances, if any, the Court should or would be willing to withdraw any prior decisions in this case.

*See* Letter to Court from Counsel for Plaintiff (Dec. 16, 2003). That assessment was confirmed by counsel for the Government:

> [T]he most significant issues separating the parties seem to be twofold. The first concerns the extent of the Court's power to effect classification for future importations of substantially similar merchandise. . . . The second significant issue concerns whether the Court should or would be willing to withdraw [<u>Atteberry III</u>], and if so, under what circumstances.

*See* Letter to Court from Counsel for Defendant (Jan. 9, 2004). Plaintiff[8] and counsel for the

---

[8]In early January 2004, Plaintiff's second appointed counsel filed a Notice of Withdrawal. The letter transmitting that Notice advised that the withdrawal was "at the request of Plaintiff" and "against [counsel's] advice," but declined to provide further details, citing attorney-client privilege. *See* Letter to Court from Counsel for Plaintiff (dated Jan. 8, 2004). *See also* Plaintiff's Response to Judge Delissa A. Ridgway Order (dated Jan. 5, 2004) (filed by Plaintiff *pro se*, advising that he had dismissed his attorney); Order (Jan. 16, 2004) (acknowledging Notice of Withdrawal, as well as Plaintiff's notice, and granting leave to withdraw appearance).

The first lawyer appointed to represent Plaintiff withdrew under similar circumstances.

Government subsequently participated in a settlement conference with another judge of the court. However, no agreement resulted.

The Government persevered in an effort to come to some understanding with Plaintiff. The parties filed multiple submissions, conferred with one another, and participated in another teleconference with the Court in an effort to reach an agreement. Regrettably, those efforts once again came to naught, and the Government "felt constrained" to file the motion here at issue. *See* Letter to Court from Counsel for Defendant (May 21, 2004).

## II. Analysis

Granting the Government's motion will – in the words of USCIT Rule 1 – "secure the just, speedy, and inexpensive determination" of this action. Granting the motion will spare the Government the need to soldier on with this litigation for the sole purpose of preserving its potential future right to appeal Atteberry III. Although the Government's reading of Atteberry III seems to be overly broad and its fears about the potential implications of the decision appear unwarranted, the bases for the opinion are obviated if the Government's Motion to Dismiss is withdrawn. The Government's proposal thus reflects a creative, constructive, and eminently practical (if unusual) means of resolving its own concerns on the jurisdictional issue, while at the same time protecting the interests of other parties.

---

Apparently dissatisfied because the lawyer had declined to file with the Court certain papers that Plaintiff himself had drafted, Plaintiff filed a Motion to Dismiss Attorney of Record (dated May 12, 2003). *See* Plaintiff's Request That The Court Reconsider Court Rejection of Plaintiff's Motion in Response to Motion for Summary Judgment, and Denial of Defendant's Motion to Dismiss (dated May 12, 2003). His counsel filed a Notice of Withdrawal about a week later, indicating that the action was "at the request of Plaintiff."

Further, granting the Government's motion will afford Plaintiff the full measure of relief to which he would be entitled, even assuming that he were to eventually prevail on the merits of his classification claim before this Court. Indeed, to the extent that the Government has signaled its interest in a possible future appeal of Atteberry III, granting the Government's motion actually affords Plaintiff *greater relief* than he could be accorded even if he prevailed on his classification claim on summary judgment or at trial before this Court, because granting the Government's motion obviates the possibility of Plaintiff's loss on appeal.[9]

Finally, contrary to Plaintiff's belief, even if this action were to proceed and he were to prevail on the merits of his classification claim on summary judgment or at trial, such a determination would have no *res judicata* effect as to any future importations. Thus, Plaintiff could not achieve the type of "victory" that he seeks even if the Government's motion were denied.

In short, as discussed in greater detail below, granting the Government's motion is manifestly "in the interests of justice," and Plaintiff's objections to the motion are unfounded.

### A. Withdrawal of the Government's Motion to Dismiss

At various points, the Government has suggested that – notwithstanding its general inclination to reach some amicable resolution of this matter – it might feel compelled to press on with this litigation for the sole purpose of preserving its potential right to appeal Atteberry III. *See,*

---

[9]Granting the Government's motion not only protects Plaintiff against potential loss on appeal on jurisdictional grounds, it protects him against potential loss on appeal on the merits of his classification claim as well.

*e.g.*, Def.'s Brief at 6; Letter to Court from Defendant (May 21, 2004); Def.'s Letter Memorandum (Feb. 2, 2004) at 2.[10]

As a threshold matter, the Government expresses concern that "at the least, . . . the record underlying [Atteberry III] was not fully developed," and indicates that the decision in Atteberry III took the Government by surprise. *See* Def.'s Brief at 1-2.[11] However, in response to the Government's Motion to Dismiss, Plaintiff argued that the "Customs Service at no time has told me/mentioned/or tried to inform me [that] I owed them the amount of $ 542," and that "I never received a Bill . . . from Customs that I owed duties . . . . My defense to the Government claim is simple[;] I was never billed, nor asked to pay duties." *See* Plaintiff's Response to Defendant's Memorandum in Response to Motion for Summary Judgment and Denial of Defendant's Motion to Dismiss (dated April 24, 2003); Plaintiff's Response to Judge Delissa A. Ridgway (dated March 31, 2003) at 2.

Particularly in light of the relatively relaxed standards applied in construing the submissions of *pro se* litigants, the quoted language seems more than sufficient to put both the Court and the

---

[10]The Government apparently evaluated various avenues of appeal, tentatively concluding that Atteberry III could not appealed on an interlocutory basis, and that – depending on how the case is resolved on the merits – the decision might not be appealable at the end of the case. *See, e.g.*, Def.'s Letter Memorandum (Jan. 22, 2004) at 4; Def.'s Letter Memorandum (Feb. 2, 2004) at 2; Def.'s Brief at 2, 6; Letter to Court from Defendant (May 21, 2004).

[11]*See also* Def.'s Letter Memorandum (Jan. 22, 2004) at 5-6 (arguing that Atteberry III was "essentially grounded . . . on disputed factual matters as to which the Government never had an opportunity for . . . discovery," stating that "the Court in effect wrote [Atteberry III] concerning a novel area of jurisdictional jurisprudence without the Government's even having the opportunity to submit any brief on the issue," and asserting that "[Plaintiff] did not raise the jurisdictional grounds relied on by the Judge; the Court acted *sua sponte*").

Government on notice of the gravamen of Plaintiff's jurisdictional argument – *i.e.*, that he never received a bill for the outstanding duties.[12] Moreover, to the extent that the Government believes that it would have been better to have a more complete factual record as a basis for its Motion to Dismiss and the Court's decision thereon, it has only itself to blame. The Government voluntarily chose to file its motion at the outset of the case, in lieu of an Answer and before seeking discovery. Even after the Court began inquiring into Customs' billing practices and obligations, the Government did not seek to withdraw its Motion to Dismiss, or to defer action on the motion pending discovery.[13] Any claim of ambush thus has a hollow ring.

The Government also suggests that Atteberry III absolves Plaintiff of all responsibility, and asserts that "it is unfair to Customs – both to the field officers and to the managers responsible for them – to effectively excuse Atteberry from taking care of business." *See generally* Def.'s Brief at 3-4. The Government emphasizes that there was "a three or four month window between October

---

[12]In addition to Plaintiff's submissions, the Government was also on the receiving end of several letters from the Court that put the parties on notice that, *inter alia*, the Court was analyzing Customs' billing practices and obligations under its regulations vis-a-vis Plaintiff's claim that he was never billed. *See generally* Letter to Parties from the Court (May 23, 2003); Letter to Plaintiff from the Court (June 3, 2003). Those letters made it clear to any reader that the Court viewed this action as something other than a straightforward "garden variety" case of a prospective plaintiff's failure to pre-pay outstanding duties (as the Government sought to portray it).

Indeed, even before Atteberry III issued, the Government staked out its position, taking exception to the Court's inquiries into Customs' billing practice and similar matters. *See* Def.'s Letter Memorandum (June 12, 2003). The Government thus obviously appreciated (and, moreover, affirmatively objected to) the fact that, in considering the Government's then-pending Motion to Dismiss, the Court was looking beyond the conceded fact of Plaintiff's failure to pay the outstanding duties before filing this action.

[13]Nor did the Government seek reconsideration of Atteberry III after the fact.

21, 2001 and early February 2002, during which Customs had virtually no new mailing address for

[Plaintiff] and sent out four bills to his address of record." *See* Def.'s Brief at 3. While those facts

are true, they are also largely irrelevant to the narrow holding in Atteberry III, which focused on a

different (and, for purposes of subject matter jurisdiction, much more critical) timeframe – the 180-

day period after Customs' mailing of the denial of the protest, during which time Plaintiff had to act

to perfect jurisdiction in this Court, and during which time the agency admits that it sent no bills to

Plaintiff at any address. *See* Atteberry III, 27 CIT at 1082, 1085 n.36, 1094-95.[14]

Distilled to its essence, Atteberry III held that – in the unusual circumstances of this case –

because 28 U.S.C. § 2637(a) clearly contemplates that importer will be on notice of amount of duties

to be paid, where Customs failed to send Plaintiff even a single bill within the 180-day period during

which Plaintiff had to perfect jurisdiction in this court, Plaintiff's failure to pre-pay the duties did

---

[14]Indeed, Atteberry III expressly disclaimed any need to reach the issue of Customs' actions prior to April 2002, when the notice of denial of Plaintiff's protest was mailed to him. *See* Atteberry III, 27 CIT at 1085 n.36.

The Government notes that "though plaintiff was required to pay [Customs'] bills within 30 days, he did not," and argues that "[i]t is unfair to hold someone in [Plaintiff's] shoes faultless." *See* Def.'s Brief at 4.

As discussed above, the time period before the mailing of the notice of denial of Plaintiff's protest is essentially irrelevant for purposes of jurisdiction. But that is not to say that no consequences attached to Plaintiff's conduct. As a result of his actions and omissions during that period (and beyond) – including, for example, his failure to file a notice of change of address with the U.S. Postal Service, and his failure to ensure that Customs had on file an up-to-date address for him – Plaintiff apparently failed to receive any of the four bills that Customs sent him. In effect, Plaintiff's actions and omissions operated to deprive him of the opportunity to minimize the amount owed by paying Customs' assessment promptly. Interest on the assessed duties therefore continued to accrue, ensuring that the Government would be made whole notwithstanding Plaintiff's delay in payment. Thus, nothing in Atteberry III held Plaintiff "faultless," and nothing exempted him from the accrual of interest on the principal owed, much less the payment of the duties assessed.

not deprive the court of jurisdiction. In so holding, Atteberry III addressed two inter-related arguments advanced by the Government, relating to Customs' recordkeeping and billing practices..

First, the Government argued that – notwithstanding 19 C.F.R. § 24.3a(d)(1) – Customs was not required to continue sending Plaintiff monthly bills, because Plaintiff had no "address of record" on file with the agency. Second, according to the Government, Plaintiff had no "address of record" on file with the agency because changes to an importer's "address of record" can be made only by submitting a Customs Form CF 5106, "Notification of Importer's Number or Application for Importer's Number, or Notice of Change of Name or Address" ("CF 5106"); thus, the Government argued, Plaintiff's e-mail to Customs in early April 2002 – which provided his "current mailing address," in response to the agency's request – could not constitute an official notice of change of his "address of record."[15]

In its pending motion, the Government explains that Atteberry III poses potential operational problems for Customs, as to both recordkeeping and billing. According to the Government, those operational concerns – as well as concerns about the precedential effect of the opinion – would weigh in favor of appealing Atteberry III (if possible) at the conclusion of this case on the merits.

---

[15]Both the Government and the Court have referred frequently to the concept of an importer's "address of record." It is worth noting, however, that the term does not appear either in Customs' billing regulations (for example, 19 C.F.R. § 24.3a(d)(1)) or in 19 C.F.R. § 24.5(a), the regulation that the Government cites as authority for the proposition that changes to importers' "addresses of record" can be made only by submitting a CF 5106. Nor does it appear on CF 5106 itself.

### 1. Concerns About Implications for Customs' Recordkeeping Practices

The Government intimates that Atteberry III makes it "incumbent on a Customs field officer to attempt to make changes to an importer's permanent records without proper authorization from that individual." *See generally* Def.'s Brief at 2, 4-6; Def.'s Supp. Brief at 1-4. The Government cautions that such a requirement "could well lead to more mistakes, rather than fewer, being made in [Customs'] processing and communication of information required by importers." Def.'s Brief at 2.[16]

---

[16]In its brief, the Government describes the events of April 2002 relevant to this case:

[The Customs Entry Specialist who contacted Plaintiff in early April 2002] had a job to do, and that was to mail a protest decision to plaintiff. Since the protest stated "No Address at present," she wrote to [Plaintiff] at the e-mail address he had put on the Protest in December 2001. In an e-mail reply, [Plaintiff] sent her his "current" mailing address. Presumably he wanted to know if his protest prevailed. Period. Did he ask whether *she* could make the same change to his permanent mailing address? No. Did he ask how *he* might make the same change to his permanent mailing address? No. Did he inform [the Customs Entry Specialist] that this address should be treated by Customs as his permanent mailing address? No. Did [the Customs Entry Specialist] have any authority to assume that [Plaintiff] wanted the address to be recorded by Customs as his permanent address, particularly where there was nothing in writing to that effect? No. What are her responsibilities at this point? None.

Def.'s Brief at 5. But this line of argument is too facile, for several reasons. Just as the term "address of record" is not used in the relevant Customs regulations or on CF 5106, so too those regulations and the form make no mention of "permanent mailing address." And it is far from clear that Customs can insist that an importer employ some specific linguistic formulation in such a situation, particularly where (as here) the importer in question is not required by the terms of 19 C.F.R. § 24.5(a) to use CF 5106 to make a change of address.

Most telling, however, is the Declaration of Arthur Versich, proffered by the Government to establish that CF 5106 is the sole means of giving notice of change of address. The Versich Declaration *itself* refers to an importer's address as reflected in ACS as the importer's "current mailing address" – the exact same verbiage that the Customs Entry Specialist employed in her April

The "rub" here is the Government's continued insistence that Plaintiff was required to give notice of his change of address on Customs Form CF 5106, and that any other form of notice had no effect. *See generally* Def.'s Brief at 4-6; Def.'s Supp. Brief at 3-4. As Atteberry III explained, the authority that the Government cites for that proposition simply does not support it.

In its brief in support of the motion at bar, the Government reiterated its claim that 19 C.F.R. § 24.5(a) required Plaintiff to submit an official written change of address on CF 5106. *See* Def.'s Brief at 6. However, by its terms, that regulation requires only that an individual file a CF 5106 "with the first formal entry which is submitted or the first request for services that will result in the issuance of a bill or a refund check upon adjustment of a cash collection." 19 C.F.R. § 24.5(a). And,

---

2002 e-mail exchange with Plaintiff (but which the Government claims is something entirely different from an importer's "address of record" and/or "permanent mailing address"). *Compare* Declaration of Arthur Versich (attached to Def.'s Supp. Brief) ¶ 10 *with* Atteberry III, 27 CIT at 1078-79 & n.27 (*citing* April 3, 2002 e-mail from Customs Entry Specialist to Plaintiff, requesting his "current mailing address"). Either "current mailing address" actually is a proper term of art for the importer address in the ACS database, or it is not but the Government is seeking to hold Plaintiff and other importers to a level of linguistic precision that even Customs officials themselves do not meet. In either case, the Versich Declaration lends great credence to the view that the language of the April 2002 e-mail exchange between Plaintiff and the Customs Entry Specialist should have been understood by Customs as a reference to an "address of record" for purposes of Customs' database (or, at the very least, it should have triggered some further inquiry from someone at Customs).

Finally (and more generally), the series of rhetorical questions posed by the Government (quoted above) is difficult to reconcile with the Government's assertion elsewhere that "if an importer were to write Customs a letter giving notice of an address change, then Customs would send that importer a blank CF 5106 . . . so that the address change can be properly documented in Customs records." *See* Def.'s Supp. Brief at 2. In the case at bar, Plaintiff wrote Customs a letter (actually, an e-mail message) giving notice of an address change. (Since – according to his letter of Protest – Plaintiff had "No Address at present" in December 2001, the "current mailing address" he provided to Customs in April 2002 constituted "notice of an address change.") The Government fails to explain why, in light of these facts, "Customs [did not] send that importer [*i.e.*, Plaintiff] a blank CF 5106" in April 2002, "so that the address change [could] be properly documented in Customs records."

as Atteberry III observed, "it seems clear that [Plaintiff] did nothing after mid-October 2001 which would trigger any obligations under [§ 24.5(a)]. Certainly he did not 'submit[]' a 'formal entry' after that time. Nor does it appear that, during that period, he made a 'request for services that [would] result in the issuance of a bill or a refund check.'" Atteberry III, 27 CIT at 1083.[17]

Pressed to explain its position, the Government finally (albeit grudgingly) conceded in supplemental briefing on the instant motion that 19 C.F.R. §24.5 "does not expressly state that an importer must file a CF 5106 to report a change of address," and, moreover, that "there is no regulation directly on point." *See* Def.'s Supp. Brief at 2-3.[18] But the Government apparently nevertheless still maintains that Plaintiff was obligated to use the form, and that any other means of notice was of no effect. As authority for its position, the Government now points to the Notice of Proposed Rulemaking published when § 24.5 was being promulgated. *See* Def.'s Supp. Brief at 3 (*citing* 31 Fed. Reg. 11,394 (Aug. 27, 1966)). The Notice of Proposed Rulemaking stated:

> Customs Form 5106, Notification of or Application for Importer's Number or Notice of Change of Name or Address . . . , is a new form which will be required to be filed by each importer on the first importation . . . . *Further filing will be required only* (1) *for a change in name or the address of the party filing the form*, or (2) under certain circumstances when no transaction has been filed with customs under an importer's number within the last preceding 12 months.

31 Fed. Reg. 11,394 (emphasis added).

---

[17]Atteberry III thus did not hold that 19 C.F.R. § 24.5(a) imposes no obligation on importers to file CF 5106s. Indeed, as the opinion notes, the regulation specifies certain events which trigger an obligation to file. In Plaintiff's case, however, none of those events occurred. *See generally* Atteberry III, 27 CIT at 1083.

[18]*See also* Def.'s Supp. Brief at 4 (admitting that "[t]here is no regulation other than 19 C.F.R. §24.5 requiring importers to use a specific form to file a change of address.").

According to the Government, the "language in the Notice of Proposed Rulemaking along with the title of CF 5106 clearly indicate *Customs' intent* that the form be used to report a change of name or address by an importer." *See* Def.'s Brief at 3 (emphasis added). But it is a longstanding and well-established principle of statutory construction that, where the language of a statute is clear, there is no recourse to legislative history. *See* 2a Norman J. Singer, Sutherland on Statutes and Statutory Construction § 46:04 (6th ed. 2000) (stating "courts are bound to give effect to the literal meaning without consulting other indicia of intent or meaning when the meaning of the statutory text itself is "plain" or "clear and unambiguous") (citations omitted)). That principle applies with equal force to regulations and their history.

Whatever Customs' intent may have been in promulgating 19 C.F.R. § 24.5, the bottom line is that – as the Government itself has now admitted – the regulation itself "does not expressly state that an importer must file a CF 5106 to report a change of address" under the circumstances presented here. *See* Def.'s Supp. Brief at 2-3; Atteberry III, 27 CIT at 1083 ("Whatever may have been the intent behind [§ 24.5(a)], *nothing on its face applied to Mr. Atteberry*.").[19]

---

[19]In the alternative, the Government attempts to invoke 19 U.S.C. § 66. *See* Def.'s Supp. Brief at 3-4. However, that statute is inapposite. It is merely a broad grant of authority to the agency to promulgate rules and regulations, including those requiring the use of specific forms for particular purposes. Whether or not Customs *could have* promulgated a regulation requiring importers such as Plaintiff to use CF 5106 to report changes of address in the circumstances of this case, the point is that – without regard to the agency's intent – Customs in fact never did promulgate such a regulation. *But see* Atteberry III, 27 CIT at 1083 (questioning whether Customs can, by regulation, mandate the use of a particular form for changes of address) (*citing* Intercargo Ins. Co. v. United States, 83 F.3d 391, 395 (Fed. Cir. 1996).

The Government's expansive reading of 19 C.F.R. § 24.5(a) is particularly difficult to square with the explicit language of 19 C.F.R. § 111.30, which unequivocally imposes *on customs brokers* an obligation to "immediately give written notice of [a] new address to each director of a port that

It would seem to be a relatively straightforward matter for Customs to amend 19 C.F.R. §

24.5, to address the gap in the regulation highlighted by the events of this case and to ensure that the

language of the regulation itself fully reflects Customs' intent. *See, e.g.*, Def.'s Supp. Brief at 3

(*citing* Notice of Proposed Rulemaking for 19 C.F.R. § 24.5, and emphasizing that – in promulgating

the regulation – agency intended to require importers to file CF 5106 whenever there was a "change

in name or the address of the party filing the form").[20] Any such amendment would, of course, be

irrelevant to the case at bar.[21] And, in any event, granting the Government's pending motion will

moot this issue as to Plaintiff and the facts of this case.

### 2. Concerns About Implications for Customs' Billing Practices

The second basic operational issue raised by the Government concerns Customs' billing

practices and compliance with 19 C.F.R. § 24.3a(d)(1), which – in general – mandates that the

agency continue sending monthly bills to an importer's address of record "until the bill is paid or

---

is affected by the change of address." *See* 19 C.F.R. § 111.30. The existence and clarity of § 111.30 demonstrate that Customs knows how to write a regulation that – on its face – affirmatively and unambiguously imposes an obligation to immediately file changes of address with the agency. And it effectively casts in sharp relief the inadequacies in the drafting of § 24.5(a).

[20]Note, however, that – even where a regulation expressly requires the use of a specific form for a particular purpose – notice given in some other fashion is not necessarily invalid. *See, e.g.*, Intercargo Ins. Co. v. United States, 83 F.3d 391, 395 (Fed. Cir. 1996) (*cited in* Atteberry III, 27 CIT at 1083).

[21]As of the date of its Supplemental Brief, the Government advised that no relevant changes to Customs' regulations were "presently under consideration." *See* Def.'s Supp. Brief at 6.

otherwise closed." 19 C.F.R. § 24.3a(d)(1).[22] *See generally* Atteberry III, 27 CIT at 1072-74 (summarizing Customs' billing regulations). The Government asserts that Atteberry III implicitly holds that "Customs has a duty under [19 C.F.R. § 24.3a(d)(1)] to be more pro-active in billing importers – using the phone, available e-mail addresses, and so forth – rather than assuming that Customs can simply bill to the importer's address of record." *See generally* Def.'s Brief at 6.

The Government misreads Atteberry III. Nothing in that opinion should be understood to suggest that § 24.3a(d)(1) requires Customs to do anything more than send regular monthly bills to an importer's "address of record" – although, to be sure, one of the central issues addressed in the opinion is what an importer's "address of record" is, and how that address can be changed.

In the case at bar, however, Customs sent four bills to Plaintiff's "address of record," then simply ceased billing entirely. If (as the Government acknowledges) § 24.3a(d)(1) requires Customs to continue sending monthly bills to an importer's "address of record," and if – according to the Government – Plaintiff never properly changed that "address of record" – it is unclear why Customs ceased sending bills to that address.[23]

As Atteberry III observed, "Logically, it would seem that an importer's 'address of record' should – like a 'last known address' – remain his 'address of record' until replaced by a new 'address

---

[22]As Atteberry III explains, "under Customs' regulations, it is not the act of liquidation – but, rather, the bill for supplemental duties and interest – that triggers the importers' obligation to pay." *See generally* Atteberry III, 27 CIT at 1090 n.43 (citations omitted). "Moreover, billing is mandatory under the statutory and regulatory scheme. It is no mere 'courtesy' or formality." *Id.* (citations omitted).

[23]The related question – why Customs failed to send bills starting in April 2002 to the address that Plaintiff supplied to Customs when asked for his "current mailing address" – is addressed in Section II.A.1, above.

of record.'" Atteberry III, 27 CIT at 1082 n.33. "Customs cannot have it both ways. If, by Customs' logic, the Kenmore address remained [Plaintiff's] 'address of record' until [it was] changed via some particular form or procedure, then – by Customs' logic – the agency should have continued to send bills to that address." *Id.*

The Government states that Customs stopped sending bills to Plaintiff's "address of record" because the first bill (sent on or about October 21, 2001) was returned to Customs as undeliverable, in late December 2001. According to the Government, "[h]aving received the notification that the addressee was not at the address of record, Customs discontinued the mailing of the bills to that address." *See* Def.'s Supp. Brief at 5.[24] But there is some inconsistency inherent in that explanation.

First, Customs in fact did not cease billing promptly upon the return of the first bill in late December 2001. At least one more bill was sent thereafter – the bill sent on or about February 3, 2002. *See* Atteberry III, 27 CIT at 1078 n.26.

Second, since (as discussed above) Customs' theory of "addresses of record" would seem to require that an importer's "address of record" remain his "address of record" until he formally and officially changes it via submission of a CF 5106, it is unclear in the case at bar what address (if any) Customs viewed as Plaintiff's "address of record" after the first bill was returned in December 2001.[25]

---

[24]Significantly, the Government does not suggest that Customs' decision to stop sending bills to Plaintiff's "address of record" was based on Plaintiff's notation on his December 26, 2001 letter of Protest – "No Address at present."

[25]Indeed, in its supplemental brief, even the Government itself refers to Plaintiff as having an "address of record" in April 2002, which the Government claims was not supplanted by the "current mailing address" that Plaintiff supplied to Customs for purposes of mailing the notice of

Third, the very fact that – in the case at bar – Customs apparently did alter (*i.e.*, delete)[26] Plaintiff's "address of record" in the agency's database *without* receiving any sort of formal or official notice from Plaintiff (much less a CF 5106) would seem to significantly undercut any claim that, as a matter of fundamental policy, Customs makes no changes to its database of importers' "addresses of record" absent formal submission of a CF 5106. *See, e.g.* Def.'s Supp. Brief at 4 (CF 5106 "has been consistently required by Customs to be filed by importers to report changes of address"), 5 ("without a CF 5106, Customs had no authority to substitute the address of record contained in ACS . . . [with] the 'current mailing address' provided by [Plaintiff] for purposes of receiving the denial of his protest").[27] It is more than passing strange to claim that Customs *had* the authority to unilaterally delete from the agency's database Plaintiff's "address of record" absent the submission of a CF 5106 and based solely on the return of a single piece of correspondence,[28] while

denial of his protest. *See* Def.'s Supp. Brief at 5. That language suggests that – metaphysically speaking – the Government understands the concept of "address of record" to mean that an importer's "address of record" continues to be his "address of record" *until replaced by a new "address of record"* (and, thus, that an importer cannot have no "address of record").

[26]For the sake of clarity, the term "delete" is used herein. However, Customs' ACS database apparently maintains a history of all changes made to importers' names and addresses in the database. *See generally* Declaration of Arthur Versich (attached to Def.'s Supp. Brief) ¶¶ 9-10, 12. It therefore would probably be more accurate to say that Customs "invalidated" Plaintiff's "address of record" in its database, after the October 2001 bill was returned to the agency as "undeliverable" in late December of that year.

[27]*See also* Atteberry III, 27 CIT at 1084 (*quoting* Def.'s Letter Memorandum (June 12, 2003) ¶ 23 ("without [a CF 5106 change of address form], no address changes are authorized to be made by Customs in ACS"; "Customs officials had no authority to input an address change into ACS without a CF 5106")).

[28]As indicated in note 24 above, the Government does not claim that Customs stopped sending bills to Plaintiff's "address of record" based on the notation on his December 2001 letter of

– at the same time – claiming that Customs *lacked* the authority to enter into its database as Plaintiff's "address of record" an address that Plaintiff himself supplied to Customs when asked by an agency official for his "current mailing address."

Finally, it bears emphasizing that the circumstances surrounding Customs' deletion of Plaintiff's "address of record" from its database are difficult to reconcile with the Government's representations about the agency's professed concern for the integrity of that database. *See, e.g.,* Def.'s Brief at 2 (referring to the "imperative that procedures function to deliver services without endangering the reliability of information going into [Customs'] databases").

As Atteberry III explains, when Customs' original bill was returned to the agency in late December 2001, "there was a handwritten notation on the envelope in which the bill was enclosed: 'not @ this address.' There is no indication in the record who made that notation. Nor is there any indication where the October 2001 bill languished for more than two months." *See* Atteberry III, 27 CIT at 1078 n.25. Moreover, none of the other three bills was ever returned to the agency. *Id.*[29]

---

Protest that he had "No Address at present." The Government thus does not claim that Plaintiff's "address of record" was deleted from the Customs database based on any affirmative authorization from Plaintiff.

[29]The Government indicates that Atteberry III requires "Customs to send bills to an importer's address of record after being notified by the post office that the importer is no longer at his address of record." *See* Def.'s Supp. Brief at 10. Those are emphatically not the facts of this case.

As outlined above, the envelope here (which was returned to Customs in late December 2001) was not the subject of any official U.S. Postal Service notice, and it bore no official return labels or stamps. Instead, there was only a handwritten notation: "not @ this address," with no indication who made the notation or where the envelope had been for more than two months (from the time it was mailed till the time it was returned to Customs). *See* Atteberry III, 27 CIT at 1078 & n.25. Nor is there any indication what became of the other three bills that Customs sent, which

Customs thus made the decision to delete an importer's "address of record" from its database --

without a CF 5106 or any other form of authorization from the importer -- based solely on the

strength of a *single* envelope, returned *months* later, bearing a *handwritten* notation.

To be sure, as the Government emphasizes, Customs is a "vast and complex" organization

confronted with the daunting task of "routinely send[ing] bills, refunds and various notices to

*thousands* of importers *daily*." *See* Def.'s Brief at 2; Def.'s Supp. Brief at 10. And it is beyond cavil

that "the function of how changes should be made to Customs' database are best handled

administratively, . . . rather than judicially." *See* Def.'s Brief at 2, 6.

In any event, as noted above, the issues at the heart of <u>Atteberry III</u> are not Customs' billing

practices *per se*, but -- rather -- the closely related questions of what an importer's "address of record"

is, and how that address can be changed. To the extent that Customs' billing practices are implicated

in that opinion, granting the Government's pending motion will effectively moot the issue.

---

were never returned to the agency. *Id.*

<u>Atteberry III</u> outlined in some detail the various risks inherent in assuming (as Customs apparently does) that, simply because a single piece of mail is returned as "undeliverable," future mailings to that address will necessarily be futile. *See generally* <u>Atteberry III</u>, 27 CIT at 1082 n.33.

As noted there, "one of the inherent virtues of a regulatory scheme of monthly billing is that, even if one properly-addressed bill is somehow waylaid or lost in the mails, subsequent bills will reach their destination. Thus, in such a scheme, notice is not entirely dependent on one single bill." <u>Atteberry III</u>, 27 CIT at 1083 n.33.

### 3. Concerns About Precedential Effect

Apart from its concerns about the impact of Atteberry III on Customs' day-to-day recordkeeping and billing operations, the Government also expresses concern about the precedential effect of the opinion. According to the Government, it is "highly likely" that the Government would pursue an appeal, if possible, at the conclusion of this case on the merits, "due to the far-reaching effect of the decision." *See* Def.'s Brief at 6; *see also* Def.'s Letter Memorandum (Jan. 22, 2004) at 3-4; Def.'s Supp. Brief at 9-10; Def.'s Letter to the Court (May 21, 2004); Def.'s Letter Memorandum (Feb. 2, 2004) at 2.

It remains unclear why the Government finds Atteberry III so unsettling. The holding was intentionally drawn to be relatively narrow, and limited to the specific facts of the case – and, as the Government has acknowledged, those facts appear to be unique. *See* Def.'s Supp. Brief at 10. Indeed, the language of the opinion itself emphasizes that it "represents no grand assault on the citadel of sovereign immunity." Atteberry III, 27 CIT at 1094. Rather, "[t]he holding . . . is very limited indeed" – *i.e.*, limited to cases where Customs not only (1) "was on actual notice of an importer's current mailing address," and (2) "in fact, used that [current mailing] address to mail its Notice of Denial of Protest to him," but also nevertheless (3) "failed . . . to send the importer even a single bill at that address during the critical 180-day period that followed." *Id.*

The Government has nevertheless voiced fears that Atteberry III could prove to be the proverbial "camel's nose under the tent" – that is, that "while the facts of this case appear to be unique, [Atteberry III] may be interpreted and cited for the proposition that, contrary to 28 U.S.C. § 2637(a) and the well-established judicial precedent, liquidated duties do not always have to be paid

in order to commence a court action under 28 U.S.C. § 1581(a). Plaintiffs may argue that the principles of [Atteberry III] apply to other factual scenarios where liquidated duties were not paid for some reason." *See* Def.'s Supp. Brief at 9.[30]

Initially, the Government even forecast a potential "flood[]" of "new litigation." *See* Def.'s Letter Memorandum (Jan. 22, 2004) at 4. Fortunately, that dire prediction has not been borne out by time. All signs indicate that the members of the customs and international trade community read the opinion as narrowly as it was written. Atteberry III thus has not triggered an avalanche of cases.

### 4. Withdrawal of the Motion to Dismiss and Vacatur of Atteberry III

In short, the Government's concerns about the reach of Atteberry III may well be exaggerated. On the other hand, there is more than a kernel of truth in the adage that "hard cases make bad law" – and, in many ways, this is indeed a "hard case," both on the facts and the law.

As the Government aptly observes, "even in a context of continuing disagreement over the relative saliency of the facts, surely it is in the interests of justice for this case to end." *See* Def.'s

---

[30]The Government worries that, notwithstanding the unique facts of the case and the narrow holding of the opinion, Atteberry III may "undermine[] the long-standing and well-established legal principle that the payment of liquidated duties at the time of the commencement of a court action pursuant to 28 U.S.C. § 1581(a) is a condition precedent to invoking the jurisdiction of the Court of International Trade, which has been strictly construed by the courts." *See* Def.'s Supp. Brief at 9 (*citing* Glamorise Foundations, Inc. v. United States, 11 CIT 394, 661 F. Supp. 630 (1987); Am. Air Parcel Forwarding Co. v. United States, 6 CIT 146, 573 F. Supp. 117 (1983); Melco Clothing Co. v. United States, 16 CIT 889, 804 F. Supp. 369 (1992)).

But Atteberry III clearly distinguished this case from the line of cases that the Government cites. *See* Atteberry III, 27 CIT at 1081 & n.32. As Atteberry III explained, unlike the case at bar, none of those cases "involved a claim that Customs had failed to notify the importer of the duties and interest owed." *Id.*

Brief at 1; *see also* Def.'s Brief at 6 ("At this point, this is not an appeal and we are not asking for a reversal. . . . [W[e believe that it is less important to the fair and efficient resolution of this case that we are right, than the fact that reasonable minds could differ, and that due to the far-reaching effect of [Atteberry III], it is highly likely the Government would pursue an appeal."). Particularly in light of the *sui generis* nature of the case and the relatively modest amount in dispute, it makes little sense to require the Government to persevere in this litigation simply to preserve its potential right to appeal Atteberry III at some point in the future. And, if the Government's Motion to Dismiss is withdrawn, the grounds for that opinion are obviated.

Plaintiff objects to allowing the Government to withdraw its Motion to Dismiss, and to vacating Atteberry III. According to Plaintiff: "They [the Government] have whined insistently about what a burden this ruling will have on Customs and it must be changed. Changing the Ruling would Settle the case in the Government's favor." *See* Pl.'s Supp. Brief at 2. The general thrust of Plaintiff's objection thus appears to be that vacatur of Atteberry III will somehow diminish his victory over the Government. *See* Pl.'s Brief at 1 ("All other things my time limits and paying the Cost have been ruled upon. It is now time for Summary Judgment on the part of Plaintiff."). However, as explained elsewhere herein, the result of granting the Government's motion is to award Plaintiff the full measure of relief to which he would be entitled if he were to prevail on every issue at every stage of litigation, and the case went all the way to the U.S. Supreme Court.[31]

---

[31]In any event, as the Government points out, granting the pending motion will not make Atteberry III simply disappear (as Plaintiff seems to fear). Plaintiff will still be able to point to the opinion "on the books." As the Government puts it, "the underlying rationale" of the decision is "still . . . 'out there' as a model, its persuasiveness commensurate with the interest taken in it." *See* Def.'s Brief at 3.

Moreover, contrary to Plaintiff's implications, there is there nothing questionable or improper about the Government's proposal. *See, e.g.,* Plaintiff's submission captioned Mailing Address Notice, Phone and Email, Fax (undated, served Jan. 16, 2004) ("[A]s for [Atteberry III] being revised, I think this is for the appeal courts, if the Defendant doesn't like it. Not to reargue it in front of the Judge cause they don't like it. I've never seen it work that way without someone screaming injustice."). The Government correctly observes that a trial court "always ha[s] the power to modify earlier orders in a pending case." *See* Def.'s Brief at 9 (and cases cited there) (*quoting, inter alia,* Kapco Mfg. Co. v. C&O Enterprises, Inc., 773 F.2d 151, 154 (7th Cir. 1985)); *see also* Def.'s Brief at 7 (court "has the inherent power to dismiss, modify or vacate . . . an interlocutory order, prior to the entry of final judgment").

In the circumstances of this case, it is clear that the exercise of the Court's inherent power will serve the interests of justice, and will work to secure "the just, speedy, and inexpensive determination" of this action. *See* USCIT Rule 1. The Government's Motion to Withdraw Defendant's Motion to Dismiss is therefore granted, and Atteberry III is vacated.

## B. Amendment of the Answer

In addition to seeking to withdraw its Motion to Dismiss, the Government also requests leave to amend its Answer to admit that Plaintiff's merchandise is classifiable as entered. *See* Def.'s Brief at 10, 12. Plaintiff opposes the Government's request – apparently because it is conditioned on the granting of the Government's motion to withdraw its Motion to Dismiss and the vacatur of Atteberry III. *See* Pl.'s Response to Amended Answer ("Its either amended or its not, Plaintiff won't except

[accept] conditions . . . Plaintiff will accept the Defendants admitting that The Karts are as he Claims without conditions.").

Under the Rules of the Court, a party may amend its pleading in the circumstances presented here only with the written consent of the opposing party, or by leave of the Court. However, "leave shall be freely given when justice so requires." USCIT Rule 15(a). As detailed herein, granting the pending motion will afford Plaintiff the full measure of relief to which he could be found entitled in this action, and will further "the just, speedy, and inexpensive determination" of the case, in accordance with the Rules of the Court. *See* USCIT Rule 1.

Justice therefore requires that the Government be granted leave to amend its Answer.

## C. Entry of Judgment on the Pleadings

The Government's final request for relief seeks the entry of judgment on the pleadings. Pursuant to Rule 12(c) of the Rules of the Court, any party may move for judgment on the pleadings, provided that the pleadings are closed and that the motion will not delay trial. *See* USCIT Rule 12(c). Such a motion is "designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." Forest Labs., Inc. v. United States, 29 CIT ____, ____, 403 F. Supp. 2d 1348, 1349 (2005), *aff'd*, ____ F.3d ____, 2007 WL 150438 (Fed. Cir. Jan. 23, 2007) (*citing* Hebert Abstract Co. v. Touchstone Properties, Ltd., 914 F.2d 74, 76 (5th Cir. 1990)). *See generally* 12 James Wm. Moore *et al.*, Moore's Federal Practice § 12.38 (3d ed. 1999).

As the Government points out, however, this is no typical motion for judgment on the pleadings. *See* Def.'s Brief at 11 (contrasting the case at bar with Chang v. United States, 859 F.2d

893, 894 (Fed. Cir. 1983)). In the usual case, a defendant seeks judgment dismissing a plaintiff's

complaint because there is no state of facts that plaintiff could prove that would entitle him to relief.

Thus, in general, entry of judgment on the pleadings is limited to situations "where 'it appears to a

certainty that plaintiff is entitled to no relief under any state of facts which could be proved in

support of his claims.'" Owen v. United States, 851 F.2d 1404, 1407 (Fed. Cir. 1988) (citations

omitted).

In contrast to the conventional case, the Government here seeks to have judgment entered

*against Defendant* and *in favor of Plaintiff*, granting Plaintiff all relief to which he is legally entitled

under his Complaint. *See* Def.'s Brief at 11. But Plaintiff opposes the entry of judgment in its favor,

and seeks trial (or summary judgment) instead. *See* Pl.'s Brief at 1 (Plaintiff is entitled to ruling

either through trial or Summary Judgment . . . Defendants know that they will lose the classification

issue. And they want to Cut Their [losses].").

Apparently, Plaintiff is resisting the Government's offer of judgment on the pleadings and

insisting on his "day in court" because he believes that a decision on the merits of his classification

claim will serve as *res judicata* as to future imports. *See* Pl.'s Brief at 1 ("Plaintiff wants a ruling

from the Court finding that the Karts are Classified at the time of import. As it sets Plaintiff on equal

footing when Plaintiff imports the Karts again. Plaintiff wants a ruling on the Classification issue

. . .").[32]

---

[32]*See also* Pl.'s Letter Memorandum (Dec. 16, 2003) (noting that one of the two significant issues frustrating settlement discussions is "the extent of the Court's powers regarding classification for future importations"); Def.'s Letter Memorandum (Jan. 9, 2004) (noting parties' disagreement as to "the extent of the Court's power to effect classification for future importations of substantially similar merchandise").

Even if this case were to be decided on the merits, and even if Plaintiff prevailed (both here and on appeal), the relief that Plaintiff seeks would elude him. As discussed in the Court's March 18, 2004 teleconference with the parties (and as summarized in Defendant's Letter Memorandum of January 22, 2004), the Supreme Court has held that, in customs classification cases, a determination of fact or law with respect to one importation is "not *res judicata* in respect of a subsequent importation involving the same issue of fact and the same question of law." United States v. Stone & Downer Co., 274 U.S. 225, 233-37 (1927). *See also* Avenues in Leather, Inc. v. United States, 317 F.3d 1399 (Fed. Cir. 2003); 3V, Inc. v. United States, 23 CIT 1047, 83 F. Supp. 2d 1351 (1999); *cf.* Daimler Chrysler Corp. v. United States, 442 F.3d 1313, 1321 (Fed. Cir. 2006); Avenues in Leather, Inc. v. United States, 423 F.3d 1326, 1330-31 (Fed. Cir. 2005); Outlet Book Co. v. United States, 14 CIT 458, 465, 743 F. Supp. 881, 888 (1990); Schott Optical Glass, Inc. v. United States, 750 F.2d 62, 64 (Fed. Cir. 1984). *See generally* Def.'s Letter Memorandum (Jan. 22, 2004) at 1-2.

The effect of the admissions in Defendant's Amended Answer, together with its Motion for Judgment on the Pleadings in favor of Plaintiff, thus is to grant Plaintiff all the relief to which he could be legally entitled – classification (and reliquidation) of his merchandise, duty-free, as it was entered. Plaintiff has nothing more to gain (and, indeed, potentially much to lose) by proceeding with litigation.

Deposit Guaranty National Bank v. Roper, 445 U.S. 326 (1980), presented the question whether a plaintiff who is offered all the relief he demands may refuse that offer and insist on a trial instead. The answer is no. According to Roper, a party "who receives all that he has sought

generally is not aggrieved by the judgment affording that relief and cannot appeal from it." Roper, 445 U.S. at 333. Indeed, the Court suggested that the same principle would likely apply to a plaintiff who was offered all he sought before trial. *See also* 3V, Inc. v. United States, 23 CIT 1047, 83 F. Supp. 2d 1351.[33]

Where – as here – the Government is willing to provide all the relief legally available to Plaintiff by reliquidating Plaintiff's merchandise as entered, duty-free, there is no longer a case or controversy between the parties, and the Government's Motion for Judgment on the Pleadings in favor of Plaintiff must be granted.

---

[33]In 3V, Inc, the plaintiff challenged Customs' classification of its imported merchandise in one duty-free provision of the HTSUS, arguing that the merchandise was properly classifiable in another duty-free provision. The court granted the Government's motion to dismiss the action for lack of a justiciable controversy, holding that it did not present a live case or controversy as required by Article III of the U.S. Constitution. 3V, Inc. v. United States, 23 CIT at 1049, 83 F. Supp. 2d at 1353. The court there explained:

> The only possible interest Plaintiff has is in the effect of a classification determination on future cases. . . . [D]eclaratory relief sought to affect the outcome of future entries is not available for § 1581(a) classification cases.

3V, Inc., 23 CIT at 1050, 83 F. Supp. 2d at 1353 (citation omitted). The court concluded that – because neither party had an interest or stake in the outcome of the case – the classification decision was moot. 23 CIT at 1049, 83 F. Supp. 2d at 1353. *See also* Vanderhoof Specialty Wood Prods., Inc. v. United States, 28 CIT ____, ____, 2004 WL 483164 at * 2 (and cases cited there) (2004).

### III. <u>Conclusion</u>

For all the reasons set forth above, Defendant's Motion to Withdraw Its Motion to Dismiss, To Amend Its Answer, and For Judgment on the Pleadings in favor of Plaintiff must be granted. Judgment will enter accordingly.

/S/        <u>Delissa A. Ridgway</u>
Judge

Decided:  January 25, 2007
New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

DANIEL ATTEBERRY,

Plaintiff,

v.                                          Court No. 02-00647

UNITED STATES,

Defendant.

## JUDGMENT

In accordance with Slip Opinion 07-13 issued this date in this matter,

NOW, therefore, in conformity with said decision, it is hereby

ORDERED, ADJUDGED, and DECREED that Defendant's Motion to Withdraw Its Motion to Dismiss is granted; and it is further

ORDERED, ADJUDGED, and DECREED that Defendant's Motion to Dismiss Plaintiff's Action for Lack of Subject Matter Jurisdiction (dated February 14, 2003) is deemed withdrawn as of this date; and it is further

ORDERED, ADJUDGED, and DECREED that Atteberry v. United States, 27 CIT 1070 (2003) is vacated; and it is further

ORDERED, ADJUDGED, and DECREED that Defendant's Motion to Amend its Answer, to admit therein the implied allegation in Plaintiff's Complaint (Plaintiff's letter to the Court of October 3, 2002) that the imported merchandise at issue in this action is classifiable as entered by Plaintiff, and to deny all other allegations in the Complaint or to deny having knowledge or information sufficient to form a belief as to the truth of those allegations, is granted; and it is further

ORDERED, ADJUDGED, and DECREED that Defendant's Amended Answer is deemed filed as of this date; and it is further

ORDERED, ADJUDGED, and DECREED that Defendant's Motion for Judgment on the Pleadings against Defendant and in favor of Plaintiff pursuant to the admissions in the Amended Answer is granted; and it is further

2

ORDERED, ADJUDGED, and DECREED that, in accordance with Defendant's Amended Answer and its Motion for Judgment on the Pleadings in favor of Plaintiff, the imported merchandise covered by Entry No. 603-1048306-4 made at the Port of Seattle, Washington, on or about May 23 or May 24, 2001, shall be classified as entered by Plaintiff; and it is further

ORDERED, ADJUDGED, and DECREED that the Bureau of Customs and Border Protection of the U.S. Department of Homeland Security shall reliquidate Entry No. 603-1048306-4 as entered by Plaintiff Daniel Atteberry, and shall refund to Plaintiff any excess duties paid, together with interest thereon as provided by law.

/S/          Delissa A. Ridgway
Judge

Dated:    January 25, 2007
          New York, New York